14 A.3d 89

**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Jason HOLMES, Appellee.**

Supreme Court of Pennsylvania.

Submitted July 14, 2010.

Decided Feb. 22, 2011.

Frank P. Barletta, Hazleton, Jacqueline M. Carroll, Luzerne County District Attorney's Office, for Commonwealth of Pennsylvania, appellant.

Joseph F. Sklarosky, Sr., Forty Fort, for Jason Holmes, appellee.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice TODD.

In this appeal by allowance, we consider whether the police articulated reasonable suspicion of a violation of 75 Pa.C.S.A. § 4524(c), relating to windshield obstructions, to support a traffic stop of the vehicle driven by Appellee Jason Holmes. For the reasons discussed below, we conclude the Superior Court properly found the evidence did not support the suppression court's finding of reasonable suspicion, and, as a result, that the traffic stop of the vehicle driven by Holmes was illegal. Accordingly, we affirm the Superior Court's order vacating Holmes' judgment of sentence and remanding for a new trial.

The record reveals the following factual background. On the evening of December 6, 2006, Assistant Chief Leonard Trotta[1] of the Pittston Township Police Department was on general patrol and sitting in his marked police vehicle, parked at the Sunoco gas station on Route 315.[2] According to his testimony at Holmes' suppression hearing, Officer Trotta ob-

---

1. For ease of reference, Assistant Chief Trotta is referred to herein as "Officer Trotta."

2. At trial, Officer Trotta testified that Route 315 is a four-lane roadway, with two lanes in each direction, and a speed limit of 45 m.p.h. N.T. Trial, 9/6/07, at 38–39.

served a black vehicle, at approximately 9:00 p.m., "traveling north on 315 with objects hanging from the rearview mirror which were obstructing the driver's view." N.T. Suppression Hearing, 9/4/08, at 4.[3] Officer Trotta testified that, suspecting a violation of Section 4524(c) of the Motor Vehicle Code, which prohibits an individual from, *inter alia,* driving a vehicle with any object hung from the rearview mirror that would materially impair the driver's vision through the front windshield, he "pulled out onto 315, activated [his] emergency lights, the vehicle proceeded to the entrance ramp of route—of the Turnpike. I hit my siren once. The vehicle pulled over." *Id.*[4] After requesting back up, Officer Trotta approached the driver's side of the vehicle and asked Holmes for his operator's license, proof of insurance, and proof of vehicle ownership. Another individual, Sinard Ballard, was in the passenger seat of the vehicle. Holmes provided his name, but indicated that his license was suspended and that he had no proof of ownership. Officer Trotta testified Holmes "was nervous, jittery, moving his hands back and forth and his right hand kept on going from the console onto the steering wheel and back onto the console." *Id.* at 5. The officer testified he asked Holmes to exit the vehicle, at which time the officer observed "a bulge in [Holmes'] back pocket," which the officer thought "possibly could be some type of a weapon," such as a "knife, pocket knife, a folding knife." *Id.* at 6. By that time, Officer Robert Evans of the Hughestown Police Department had arrived with his police dog. Officer Trotta testified he conducted a pat down of Holmes for safety purposes, and that he attempted to remove the "bulging" object from Holmes' pocket, at which time he discovered that the object was a bundle of $335 in cash. *Id.*[5]

3. Officer Trotta testified at the suppression hearing that it was dark at the time he observed the vehicle, but when asked by Holmes' counsel "didn't this vehicle ... have tinted windows?" Officer Trotta stated "I don't recall that." N.T. Suppression Hearing, at 12.

4. Thus, the trial court's statement that "[t]he driver of the vehicle failed to stop," Trial Court Opinion, 6/6/08, at 1, is unsupported by Officer Trotta's testimony at the suppression hearing.

5. Notably, the trial court's statement that Officer Trotta was "in fear for his safety," *id.* at 3, is contradicted by Officer Trotta's testimony that,

Officer Trotta further testified he asked Holmes if he would consent to a search of the vehicle, advising him that if he did not consent, the officers had probable cause and could get a search warrant. According to Officer Trotta, Holmes gave verbal consent to search the vehicle, after which Officer Evans had the dog perform a canine sniff of the exterior of vehicle. Holmes testified at the suppression hearing that he did not consent to a search of the vehicle. *Id.* at 9, 42.[6]

Officer Evans also testified at the suppression hearing, explaining that, when he arrived at the scene in response to Officer Trotta's call for assistance, he observed Officer Trotta and Holmes outside of the vehicle. *Id.* at 24. Officer Evans testified he observed Officer Trotta ask Holmes for consent to search the vehicle, and Holmes gave consent, although when asked at the suppression hearing to point out the driver who gave consent, Officer Evans pointed to Ballard, who was the passenger in the vehicle. *Id.* at 24–25. Officer Evans indicated that, after Officer Trotta received consent to search the vehicle from Holmes, Officer Evans had the dog perform a sniff of the perimeter of the vehicle, and that the dog "alerted" to the presence of drugs on the driver and passenger side doors. Officer Evans testified that, after the dog alerted during the exterior sniff, Ballard was removed from the passenger seat of the vehicle.[7]

after he conducted a pat down of Holmes, no weapons were drawn, neither Holmes nor Ballard was "hostile," and "it was a civil conversation." N.T. Suppression Hearing, 9/4/08, at 7.

6. In this regard, during cross-examination at the suppression hearing, Officer Trotta acknowledged that, although he prepared the affidavit of probable cause and criminal complaint, there was no mention in either document that he requested or received consent from either Holmes or Ballard to search the vehicle. N.T. Suppression Hearing, 9/4/08, at 10–11. Officer Trotta likewise acknowledged he neglected to indicate in the affidavit of probable cause that Holmes acted nervous or jittery, or had moved his hands back and forth from the steering wheel to the console. *Id.* at 14. Officer Trotta also conceded that, although the police department has forms for individuals to sign when they consent to a search, he "just didn't have them with him" that evening. *Id.* at 11.

7. Officer Evans' testimony in this regard suggests that Ballard was in the vehicle during the exterior sniff. However, at one point during the suppression hearing, the judge asked "Just so I understand this. When

Officer Evans testified that he "asked for consent again for my own knowledge and put the dog inside the vehicle." *Id.* at 26.[8] Ballard testified at the suppression hearing that he did not give anyone consent to search the vehicle. *Id.* at 44. After Ballard was removed from the vehicle, Officer Trotta conducted a pat down of Ballard, removing $3,000 from his person.

According to Officer Evans, once inside the vehicle, the dog alerted in the area of the floor and the backseat, where police found marijuana. Officer Evans testified that, after removing the dog from the inside of the vehicle, he overheard a conversation between Holmes and Ballard, suggesting that the dog would not be able to detect cocaine. *Id.* at 28. Officer Evans put the dog back inside the vehicle, where the dog alerted to the console area between the driver and front passenger seats, in which police ultimately recovered marijuana cigarettes, packets of cocaine, a digital scale, and a semiautomatic handgun and a magazine for the handgun. *Id.* at 29–30. Officer Evans testified that the items were seized and given to Officer Trotta. *Id.* at 31. After Holmes was transported to the police station, Officer Evans discovered several additional packets of cocaine in Holmes' sock. When asked at the suppression hearing if he seized the object which he observed hanging from the vehicle, Officer Trotta replied "I don't recall. I don't think so, sir." *Id.* at 19. Officer Evans also testified that he did not seize the object hanging from the rearview mirror. *Id.* at 40.

Holmes was charged with possession with intent to deliver a controlled substance ("PWID")[9] and several weapons of-

---

you did the initial sniff, was the passenger still sitting in the vehicle?" and Officer Evans replied "he was not. He was removed." *Id.* at 26. Thus, it appears that Officer Evans considered the "initial" sniff to be the first interior sniff of the vehicle.

**8.** Although Officer Evans testified that he normally carries consent forms in his vehicle, he indicated he did not have any with him that evening because he was in the process of switching vehicles, and did not obtain any consent forms before he went on duty because he "was in the process throughout the day photocopying other reports" for his duty bag. *Id.* at 35.

**9.** 35 P.S. § 780–113(a)(30).

8

fenses,[10] as well as the summary offense of driving with a suspended license.[11] He was not charged with or issued a warning for violating Section 4524(c) relating to windshield obstructions. Prior to trial, Holmes filed a motion to suppress the evidence recovered from the vehicle on the basis that the stop of his vehicle was illegal, in that Officer Trotta did not have reasonable suspicion to suspect a violation of Section 4524(c). Following a hearing on September 4, 2007, before former Judge Michael T. Conahan, the court denied Holmes' motion to suppress. On September 6, 2007, Holmes proceeded to a bench trial before Judge Conahan, wherein he was convicted of the aforementioned charges and was sentenced to 5–to–10 years in prison.

Holmes appealed his judgment of sentence to the Superior Court, and, on April 17, 2009, the Superior Court, in an unpublished memorandum opinion, vacated Holmes' judgment of sentence and remanded for a new trial. *Commonwealth v. Holmes*, 2069 MDA 2007 (Pa.Super. filed April 17, 2009). In doing so, the Superior Court relied on its decisions in *Commonwealth v. Felty*, 443 Pa.Super. 559, 662 A.2d 1102 (1995), and *Commonwealth v. Benton*, 440 Pa.Super. 441, 655 A.2d 1030 (1995). In each of those cases, the Superior Court held that the traffic stop of the appellant's vehicle was unlawful because the police officer who stopped the vehicle for an alleged violation of Section 4524(c) did not possess reasonable and articulable grounds to believe that a violation of the Motor Vehicle Code had occurred. In the instant case, the Superior Court concluded, "the case is even stronger to disallow the stop because not only was there no description of the size of the object, but there was no testimony as to what the object was." *Holmes*, 2069 MDA 2007, at 2. As a result, the Superior Court held that the stop of Holmes' vehicle was unlawful.

10.  18 Pa.C.S.A. § 6106(a)(1) (Firearms not to be carried without a license); 18 Pa.C.S.A. § 6110.2 (Possession of firearm with altered manufacturer's number); 18 Pa.C.S.A. § 6117 (Altering or obliterating marks of identification).

11.  75 Pa.C.S.A. § 1543(a).

Judge Stevens filed a dissenting statement, wherein he opined that "[Officer Trotta] articulated sufficiently specific facts from which it can be determined he had reasonable suspicion to believe [Holmes] had violated 75 Pa.C.S.A. § 4524(c) prior to the time he effectuated the stop." *Holmes,* 2069 MDA 2007, Dissenting Statement at 5. Specifically, Judge Stevens noted "[Officer Trotta] testified on direct examination at the suppression hearing, and the trial court found his statements credible, that while parked in the Sunoco gas station, he observed [Holmes'] vehicle traveling on Route 315 with objects hanging from the rearview mirror that obstructed the driver's view. He considered these objects a violation of the Motor Vehicle Code, and this violation was the basis for his stop." *Id.*

The Commonwealth filed a petition for allowance of appeal, and, on April 8, 2010, this Court granted the Commonwealth's petition with respect to the following issue:

Whether the Superior Court erred in reversing [Holmes'] judgment of sentence, based on a misapplication of the relevant precedent permitting stops of motor vehicles for an alleged violation of 75 Pa.C.S.A. § 4524(c) (windshield obstructions and wipers)?

*Commonwealth v. Holmes,* 605 Pa. 567, 992 A.2d 845 (2010) (order).

The issue of what quantum of cause a police officer must possess in order to conduct a vehicle stop based on a possible violation of the Motor Vehicle Code is a question of law, over which our scope of review is plenary and our standard of review is *de novo. Commonwealth v. Chase,* 599 Pa. 80, 88, 960 A.2d 108, 112 (2008). However, in determining whether the suppression court properly denied a suppression motion, we consider whether the record supports the court's factual findings. If so, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. *Commonwealth v. Hernandez,* 594 Pa. 319, 328, 935 A.2d 1275, 1280 (2007).

Pursuant to 75 Pa.C.S.A. § 6308(b),

Whenever a police officer is engaged in a systematic program of checking vehicles or drivers or has reasonable suspicion that a violation of this title is occurring or has occurred, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

75 Pa.C.S.A. § 6308(b).[12]

Section 4524(c) of the Motor Vehicle Code provides:

No person shall drive any motor vehicle with any object or material hung from the inside rearview mirror or otherwise hung, placed or attached in such a position as to materially obstruct, obscure or impair the driver's vision through the front windshield or any manner as to constitute a safety hazard.

75 Pa.C.S.A. § 4524(c).

In urging this Court to reverse the Superior Court's decision to award Holmes a new trial, the Commonwealth first

12. The current version of Section 6308(b) differs from the prior version, which required that an officer have "articulable and reasonable grounds to suspect a violation of [the Motor Vehicle Code]" in order to stop a vehicle. 75 Pa.C.S.A. § 6308 (amended by 2003 Pa. Laws 24, § 17, effective Feb. 1, 2004). We explained the reason for the amendment as follows:

The former version of 75 Pa.C.S. § 6308(b) required an officer to have "articulable and reasonable grounds to suspect a violation of [the Vehicle Code]" to effectuate a vehicle stop.... This Court interpreted "articulable and reasonable grounds" to be the equivalent of "probable cause," requiring police have probable cause to believe the vehicle or its driver was in violation of the Vehicle Code. *Commonwealth v. Gleason*, 567 Pa. 111, 785 A.2d 983, 986 (2001); *Commonwealth v. Whitmyer*, 542 Pa. 545, 668 A.2d 1113, 1116–17 (1995). *Gleason* thus held the *statutory* standard for stops based on potential Vehicle Code violations was probable cause, even if an investigative stop would be *constitutionally* permitted in a non-vehicle situation based on reasonable articulable suspicion. *Gleason* did so based on interpretation of the former § 6308(b). The legislature thereafter modified § 6308(b), bringing it into line with requirements of constitutional case law for stops not involving the Vehicle Code.

*Commonwealth v. Chase*, 599 Pa. at 87–88, 960 A.2d at 112 (emphasis original, footnote omitted).

contends the Superior Court's reliance on its decisions in *Felty* and *Benton* was misplaced, as those cases are distinguishable from the case *sub judice.* The Commonwealth notes, in both *Felty* and *Benton:*

> the [Superior] Court addressed vehicle stops based on alleged violations of 75 Pa.C.S.A. § 4524(c) due to alleged obstructions of a driver's vision by objects hanging from rearview mirrors. In both of those cases, the Superior Court found that the testimony of the arresting officers was insufficient to establish that the objects actually obstructed the driver's vision. In *Benton,* there was no testimony by the officer indicating that the air freshener hanging from the rearview mirror materially impaired the driver's vision. In *Felty,* the officer also failed to testify that the object materially impaired the driver's vision.

Commonwealth's Brief at 9 (citations omitted).

By contrast, the Commonwealth points out, in the instant case, Officer Trotta testified at the suppression hearing that he saw "objects hanging from the rearview mirror which were 'obstructing the driver's view,'" and that Officer Trotta was "able to observe this even before the vehicle stop." Commonwealth's Brief at 9 (citing N.T. Suppression Hearing, at 4). The Commonwealth avers "[t]his is precisely the sort of testimony regarding the obstructing item that is required under the statute, and whose absence in *Benton* and *Felty* led the court in those cases to find that reasonable suspicion did not exist." Commonwealth's Brief at 9–10. The Commonwealth further maintains the statute does not require that the police *identify* the object before conducting a vehicle stop, and that the Superior Court improperly read such a requirement into the law.[13]

As noted above, Section 6308(b) allows a police officer to conduct a vehicle stop if he has reasonable suspicion to believe that a violation of the Motor Vehicle Code is occurring

[13]. Holmes has not filed an appellate brief, but has advised this Court's Prothonotary via letter that he will rely on the reasons set forth in the Superior Court's opinion.

or has occurred.[14] We have defined reasonable suspicion as follows:

> Reasonable suspicion is a less stringent standard than probable cause necessary to effectuate a warrantless arrest, and depends on the information possessed by police and its degree of reliability in the totality of the circumstances. In order to justify the seizure, *a police officer must be able to point to "specific and articulable facts" leading him to suspect criminal activity is afoot.* [*Commonwealth v.*] *Melendez*, [544 Pa. 323, 676 A.2d 226], at 228 [ (1996) ] (citing *Terry* [*v. Ohio*, 392 U.S. 1], at 21 [88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ]). In assessing the totality of the circumstances, courts must also afford due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience and acknowledge that innocent facts, when considered collectively, may permit the investigative detention. *Commonwealth v. Cook*, 558 Pa. 50, 735 A.2d 673, 676 (1999) (citations omitted).

*Commonwealth v. Brown*, 606 Pa. 198, 996 A.2d 473, 477 (2010) (emphasis added). Thus, under the present version of Section 6308(b), in order to establish reasonable suspicion, an officer must be able to point to *specific and articulable facts* which led him to reasonably suspect a violation of the Motor Vehicle Code, in this case, Section 4524(c).[15]

▆▆▆ The determination of whether an officer had reasonable suspicion that criminality was afoot so as to justify an investigatory detention is an objective one, which must be considered in light of the totality of the circumstances. *See Chase*, 599 Pa. at 101, 960 A.2d at 120 ("[r]easonable suspicion

---

14. Although it does not impact our analysis, we note the Commonwealth, in its brief, cites the standard from the prior version of Section 6308(b), stating "[a] police officer may conduct a stop of a motor vehicle if the stop is supported by *reasonable and articulable* suspicion that the person seized is engaged in a violation of a provision of the Vehicle Code." Commonwealth's Brief at 8 (emphasis added). The Commonwealth also cites *Commonwealth v. Strickler*, 563 Pa. 47, 58, 757 A.2d 884, 889 (Pa.2000), which was decided under the prior version of Section 6308(b).

15. The Commonwealth does not challenge this requirement. *See* Commonwealth's Brief at 8 (citing *Cook, supra* ).

sufficient to stop a motorist must be viewed from the standpoint of an objectively reasonable police officer" (citing *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996))); *Commonwealth v. Rogers*, 578 Pa. 127, 134, 849 A.2d 1185, 1189 (2004) (in determining whether police officer had reasonable suspicion, "the totality of the circumstances must be considered").  It is the duty of the suppression court to independently evaluate whether, under the particular facts of a case, an objectively reasonable police officer would have reasonably suspected criminal activity was afoot.  As the United States Supreme Court has explained:

> [I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.  The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances.  And in making that assessment it is imperative that the facts be judged against an objective standard:  would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?  Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction.  And simple " 'good faith on the part of the arresting officer is not enough.'  * * * If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers and effects,' only in the discretion of the police.["]

*Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (citations and footnotes omitted).

■  This Court has recognized the concerns expressed by the Supreme Court in *Terry*, noting, for example, "before the

government may single out one automobile to stop, there must be specific facts justifying this intrusion. To hold otherwise would be to give the police absolute, unreviewable discretion and authority to intrude into an individual's life for no cause whatsoever." *Commonwealth v. Swanger*, 453 Pa. 107, 112, 307 A.2d 875, 878 (1973); *see also Commonwealth v. Murray*, 460 Pa. 53, 331 A.2d 414 (1975) (same). Moreover, as we explained in *Cook, supra*, to demonstrate reasonable suspicion, an officer "must be able to point to specific and articulable facts and reasonable inferences drawn from those facts in light of the officer's experience." 558 Pa. at 57, 735 A.2d at 677 (citation omitted). Thus, in order to establish reasonable suspicion, an officer must articulate specific facts *in addition to inferences based on those facts,* to support his belief that criminal activity was afoot.[16]

As noted above, Section 4524(c) prohibits an individual from driving a motor vehicle "with any object or material hung from the inside rearview mirror or otherwise hung, placed or attached in such a position as to materially obstruct, obscure or impair the driver's vision through the front windshield or any manner as to constitute a safety hazard." 75 Pa.C.S.A. § 4524(c). Under its plain language, a driver is not in violation of the statute simply because he has an object hanging from the rearview mirror; rather, an essential element is that the object or material hanging from the mirror *materially* obstructs, obscures, or impairs the driver's vision. Thus, while we agree with the Commonwealth that the law does not require that police be able to identify the object before making a vehicle stop, *see* Commonwealth's Brief, at 10, in order to support a suppression court's finding that an officer possessed reasonable suspicion to believe that a violation of 75 Pa.C.S.A. § 4524(c) has occurred, the officer must

16. Both *Swanger* and *Murray* were decided prior to the amendment to Section 6308(b), at a time when the statute required articulable and reasonable grounds, which, as discussed *supra* note 12, was the equivalent of probable cause, to suspect a violation of the motor vehicle code in order to support a vehicle stop; nevertheless, the concerns expressed by this Court are still relevant—that is, regardless of the applicable standard, the stop must be based on articulable facts and inferences.

articulate at least *some* fact or facts to support his inference or conclusion that the object materially impaired the driver's view.

Our consideration of other sections of the Motor Vehicle Code informs our conclusion. For example, in order to independently assess whether a police officer had reasonable suspicion to suspect a violation of Section 3361 (Driving vehicle at a safe speed), a suppression court would require more than a single statement from an officer that a motorist was driving "at a speed greater than is reasonable and prudent." 75 Pa.C.S.A. § 3361; *see Commonwealth v. Perry*, 982 A.2d 1009 (Pa.Super.2009) (holding that trial court properly determined that police officer had reasonable suspicion to stop appellant's vehicle based on suspected violation of Section 3361, where officer testified that appellant was driving fifteen miles over the 25 m.p.h. speed limit and the road was wet and slushy). Similarly, we question how a suppression court, presented only with an officer's statement that he conducted a traffic stop based on his conclusion that a vehicle was "follow[ing] another vehicle more closely than is reasonable and prudent" in violation of Section 3310, could independently assess whether the officer's suspicion was reasonable absent some additional evidence of the distance between the vehicles, the speed of the vehicles, and the road conditions. *See* 75 Pa.C.S.A. § 3310.

Based on our review of this record, we agree with the Superior Court that the testimony at the suppression hearing was insufficient to support the required independent evaluation and finding by the suppression court that Officer Trotta had reasonable suspicion to stop Holmes' vehicle for a suspected violation of Section 4524(c). At Holmes' suppression hearing, Officer Trotta's sole testimony was that he "observed a vehicle traveling north on 315 with objects hanging from the rearview mirror which were obstructing the driver's view." N.T. Suppression Hearing, 9/4/07, at 4. There was no testimony as to the size or general description of the objects hanging from the rearview mirror, or how the objects impaired

Holmes' view. Indeed, as the Superior Court found, "[t]he record is devoid of *any* description of the object or how it materially impaired the driver's vision or created a safety hazard. We cannot ascertain from the record what the object was or whether it was even capable of impairing the driver's vision." *Holmes*, 2069 MDA 2007, at 4 (emphasis original). When Officer Evans was asked at the suppression hearing what he saw hanging from the rearview mirror, he replied "[h]onestly, I do not even remember. I remember seeing it because the dog kept hitting his head off it." N.T. Suppression Hearing, 9/4/07, at 40. Neither officer seized the objects, *see supra* p. 5, and, thus, the suppression court, in addition to having no identification or description of the objects, was unable to view or make a reasonable conclusion of its own as to whether the objects were capable of impairing Holmes' vision in any material way.

Although Judge Conahan apparently found Officer Trotta's bare statement that he saw objects hanging from the mirror which "were obstructing" Holmes' view to be credible, such statement simply was insufficient to allow the suppression court to assess the reasonableness of the officer's belief that Holmes' view was obstructed, let alone *materially* obstructed, as the statute requires. *See Terry*, 392 U.S. at 12, 22, 88 S.Ct. 1868 (recognizing that police officers' "judgment is necessarily colored by their primary involvement in 'the often competitive enterprise of ferreting out crime' " and holding that good faith on part of the arresting officer is not enough to support a finding of reasonable suspicion).[17] As previously noted, Offi-

17. The dissent, it seems, would write the materiality element out of Section 4524(c) for purposes of a vehicle stop. Although the dissent recognizes that the critical issue in evaluating the legality of a traffic stop is whether the police officer reasonably believes a criminal violation may be afoot, the dissent opines that an officer need not observe a material obstruction; rather, he may observe any obstruction and *then* "investigate whether vision is blocked to the point of comprising a violation." Dissenting Opinion at 20, 14 A.3d at 100. Such an approach is contrary to the principles underlying *Terry*. Further, it would give police officers *carte blanche* to stop any vehicle with an object hanging from the rearview mirror, as any hanging object would arguably obstruct the driver's view to some degree. Yet, as discussed *supra*, Section 4524(c) does not prohibit a driver from hanging *any* object

cer Trotta failed to assert at the suppression hearing any specific and articulable facts, such as an identification or a general description of the objects he observed hanging from the rearview mirror, which, in conjunction with his reasonable inferences, led to his belief that criminal activity was afoot. Lacking any evidence of such specific and articulable facts, the suppression court in the instant case was unable to perform its required independent assessment of whether Officer Trotta had reasonable suspicion to justify a vehicle stop.

Finally, we note there are myriad · objects which drivers commonly hang from their rearview mirrors. Air fresheners; parking placards; mortarboard tassels; crosses; rosary beads; medallions of St. Christopher, the patron saint of travel; and rabbits' feet are but a few. It is not illegal for a driver to hang such items from his or her rearview mirror, so long as the items do not materially obstruct the driver's view. The legislature could have written Section 4524(c) to prohibit a driver from hanging *any* object from the vehicle's rearview mirror, or it could have prohibited hanging objects that obstruct a driver's view to any degree, but it did not; rather, it prohibited only material obstructions. Were this Court to conclude that an officer's bare testimony that he saw an object hanging from a rearview mirror which obstructed the driver's view, without any additional testimony or other evidence supporting the officer's conclusion that the object materially obstructed the driver's view, was sufficient to demonstrate reasonable suspicion to constitutionally support the intrusion of a vehicle stop, we would obviate the suppression court's role in ensuring there is an objectively reasonable basis for the vehicle stop, and expose every law-abiding motorist who hangs an object from his or her rearview mirror to a potentially unwarranted intrusion. *See Terry*.

For the foregoing reasons, we agree with the Superior Court that the evidence does not support the findings of the

from the vehicle's rearview mirror; it prohibits only *material* obstructions. Thus, unless Officer Trotta reasonably believed that the object hanging from Appellee's rearview mirror *materially* obstructed his view—which Officer Trotta did not claim at the suppression hearing—he had no legal basis upon which to stop Appellee's vehicle.

suppression court that Officer Trotta had reasonable suspicion to suspect a violation of Section 4524(c) so as to justify a vehicle stop. Accordingly, we affirm the decision of the Superior Court, which reversed Holmes' judgment of sentence and remanded for a new trial.

Order affirmed.

Justices BAER and ORIE MELVIN join the opinion.

Justice SAYLOR files a concurring opinion in which Chief Justice CASTILLE joins.

Justice EAKIN files a dissenting opinion in which Justice McCAFFERY joins.

Justice SAYLOR, concurring.

I join the majority opinion as to the issue on which allocatur was granted, see Commonwealth v. Holmes, 605 Pa. 567, 992 A.2d 845 (2010) (allowing appeal relative to the validity of the underlying vehicle stop),[1] but write separately to explain my understanding of the limits of its holding. See Majority Opinion, at 17, 14 A.3d at 98 ("Lacking any evidence of such specific and articulable facts, the suppression court in the instant case was unable to perform its required independent

---

1. Instead of limiting its recitation of the facts to this issue, the majority proceeds to develop, at length, the events following the stop. See Majority Opinion, at 4–8, 14 A.3d at 91–93 (discussing, inter alia, the pat down search of Appellee, the warrantless search of the vehicle, and the warrantless search of Appellee's person conducted after his arrest). Such facts, while perhaps providing a more complete picture of Appellee's arrest, ultimately have no bearing on the question presented.

Moreover, to the extent that such facts suggest questions concerning the veracity of the officers' testimony, see, e.g., id. at 6 n. 6, 14 A.3d at 92 n. 6, it should be noted that, not only did the suppression court credit the testimony of Officers Trotta and Evans, but their testimony was also largely uncontradicted. See N.T., Sept. 4, 2007, at 42–43 (testimony of Appellee); id. at 44–45 (testimony of Sinard Ballard); see, e.g., Commonwealth v. Stevenson, 560 Pa. 345, 349, 744 A.2d 1261, 1263 (2000) ("When reviewing the ruling of a suppression court, we must determine whether the record supports that court's factual findings. As long as the record supports the findings of the suppression court, we are bound by those facts[.]").

assessment of whether Officer Trotta had reasonable suspicion to justify a vehicle stop.").

Central to the majority's ruling is the fact that the officer's testimony amounted to a conclusory statement, in that he essentially recited the elements of the alleged Vehicle Code infraction, instead of providing a factual basis for the supposed violation. *See, e.g.,* N.T., Sept. 4, 2007, at 4. Although inadequate under these circumstances to establish reasonable suspicion to conduct a lawful vehicle stop, especially since the suppression court was without any means to evaluate whether the purported object materially obstructed Appellee's view, *see* 75 Pa.C.S. § 4524(c), such testimony may be sufficient in other instances, namely, where the alleged traffic offense does not contain a subjective component. *See, e.g., id.* §§ 3703(a) ("[N]o person shall drive any vehicle ... upon a sidewalk"), 3711(a) ("No person shall hang onto or ride on the outside or the rear end of any vehicle"). Thus, I do not view the majority's holding as foreclosing that possibility.

Chief Justice CASTILLE joins this concurring opinion.

Justice EAKIN, dissenting.

I respectfully dissent from the majority's conclusion that the officer illegally stopped appellee's car. It is true that he did not testify to specifics that allow us to review whether the obstruction was "material." This lynchpin of the Superior Court's theory, adopted by my colleagues, is true—it is also irrelevant.

The majority bases its result on the officer's failure to identify the object hanging from appellee's rearview mirror, and to describe it such that an appellate court may evaluate whether the object not only impaired the driver's vision but did so materially. If this case had anything to do with whether the evidence allowed a conviction for violating 75 Pa.C.S. § 4524(c), I would join my colleagues. We, however, are reviewing the Superior Court's reversal of a suppression order, and that review has nothing to do with proof that a Vehicle Code violation happened.

The issue is whether what the officer saw gave him reason to suspect there was such a violation. What the officer finds after the stop does not matter—it is whether he reasonably believes a criminal violation may be afoot that counts. The very reason the record does not concern itself with "materiality" is because appellee's potential violation of § 4524(c) was never an issue. There was no evidence of this element because he was not being prosecuted for such a violation.[1]

The officer testified he observed an object hanging from appellee's rearview mirror so as to obstruct the driver's vision. Whether it did so "materially"—indeed, whether it actually blocked the driver's vision at all—is neither here nor there. The purpose of the stop was, in classic *Terry* language, to investigate further. The officer need not have proof, or even probable cause at this point. Seeing an object hanging there, believing it obstructed vision as the suppression court found, would any reasonable officer *suspect* there may be a violation? If an officer sees what he reasonably believes to be blocked visibility, an uncontrived safety concern, it can hardly be illegal, as my colleagues find, to investigate whether vision is blocked to the point of comprising a violation. It is the right to stop and investigate, not the results of the investigation, that is at issue.

"In order to demonstrate reasonable suspicion, the police officer must be able to point to specific and articulable facts and reasonable inferences drawn from those facts in light of the officer's experience." *Commonwealth v. Cook*, 558 Pa. 50, 735 A.2d 673, 677 (1999) (citing *Commonwealth v. Jackson*, 548 Pa. 484, 698 A.2d 571, 573 (1997)). In this case, Assistant Chief Trotta testified he saw objects hanging from the rearview mirror *which obstructed the driver's view.* N.T. Suppression Hearing, 9/4/07, at 4. The sole issue is reasonable suspicion that visibility was materially blocked, and the fact found by the trial court as true was that the officer believed

---

1. As events after the stop led to more significant violations, it is no wonder the traffic offense fell by the wayside. That it was not prosecuted is of no moment, but it does show us why the record did not dwell on the elements of § 4524(c).

visibility *was* blocked. If this is true, is there not reasonable *suspicion* that it was materially blocked?

Again, it is not what the officer finds after the stop that determines the issue. If the officer stopped the car in the belief there were drugs in the trunk, when evaluating the stop, it matters not one bit whether drugs are ultimately found in the trunk or not. Likewise, when evaluating this stop, it matters not whether the driver's vision was materially impaired or not—if there had been nothing hanging from the mirror when the officer arrived, the stop is still valid if supported by reasonable suspicion, not proof, that vision was blocked. Something was blocking the driver's vision here, making clear the existence of reasonable suspicion there may be a violation of § 4524(c).

Accordingly, I respectfully dissent.

Justice McCAFFERY joins this opinion.